COURT OF APPEALS
DECISION
DATED AND FILED

February 17, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2025AP484**

STATE OF WISCONSIN

Cir. Ct. No. 2024GN43

IN COURT OF APPEALS
DISTRICT III

IN THE MATTER OF N. J. M.:

DOUGLAS COUNTY,

PETITIONER-RESPONDENT,

V.

N. J. M.,

RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for Douglas County: KELLY J. THIMM, Judge. *Affirmed.*

Before Stark, P.J., Hruz, and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM.  Nancy[1] appeals orders granting Douglas County's petitions for guardianship of her person and her estate and for her protective placement.  Nancy argues that the County failed to establish personal jurisdiction, pursuant to WIS. STAT. § 53.23 (2023-24),[2] to appoint a guardian and order protective placement.  For the following reasons, we reject Nancy's argument and affirm.

## BACKGROUND

¶2    On October 1, 2024, the County petitioned for temporary guardianship of Nancy's person and estate due to her incompetency and for her protective placement based on reports from the Douglas County Health and Human Services Department ("DHHS") and the Superior Police Department, which described Nancy as "a vulnerable adult who is homeless in the community." Both petitions alleged that Nancy resided in Douglas County.  According to the County, Nancy had been living in a tent on Barker's Island with her mother, Katie, and her father, Chad, since July 2024, and law enforcement had concerns that Nancy was being sexually abused by Chad due to his criminal history and statements that he made to officers.

¶3    The County also alleged that on September 26, 2024, Nancy and Katie sought services from the DHHS.  A DHHS worker reported that Nancy was unable to answer any questions or engage in conversation and that Nancy appeared extremely dirty, had deeply matted hair, was malodorous, and scratched several

---

[1] For ease of reading, we refer to the appellant in this confidential matter, and her parents, using pseudonyms, rather than initials.

[2] All references to the Wisconsin Statutes are to the 2023-24 version.

areas of her body throughout the meeting. Katie reported that Nancy was autistic, that she was Nancy's primary caretaker, that Nancy had been sexually assaulted several times, and that Nancy was incontinent at night. Although the DHHS recommended a medical evaluation for Nancy, Katie refused to allow a physician to see Nancy.

¶4     The County further alleged that on September 30, 2024, Nancy again appeared extremely dirty, malodorous, and "unable to track or engage in any form of communication." On that same day, government officials transported her to a hospital for evaluation. According to the County, medical staff determined Nancy was unable to "fully express her needs, unable to weigh out option[s] or consider consequences, or make informed choices," and Nancy was unable to "make safe decision[s] for herself and [her] health and well-being." Because of Nancy's disability "and the alleged abuse, neglect and exploitation," the County alleged that the appointment of a temporary guardian of the person and estate was necessary to protect Nancy from further harm. It also requested protective placement of Nancy.

¶5     On October 2, 2024, the circuit court held a hearing on the petitions. At that hearing, the County presented testimony from Bria Hendrickson-Schurke, an emergency medicine physician assistant; Megan Jones, a coordinated response specialist with the Superior Police Department; and Kira Johnson, an adult services worker with the DHHS who was assigned to Nancy's case. All testified about their interactions with Nancy, Katie and Chad in August and September 2024. For each interaction they had with Nancy, they described her as: disheveled, confused, dirty and odorous, agitated, itching, and with matted hair.

3

¶6 Based on their observations of and interactions with Nancy, each witness believed Nancy was a vulnerable adult who was unable to communicate her needs and unable to make safe decisions for herself. In particular, Hendrickson-Schurke testified that Nancy was "very vulnerable," that she had an "obvious delay in communication and delayed ability to process what is being said to her in addition to her ability to respond," and that she was unable to care for herself. Jones testified that Nancy was at a high risk of exploitation because of "her vulnerability, living without a home, and having possible individuals with her that may be at risk for causing sexual abuse due to their own mental health and substance use." And Johnson testified that Nancy seemed unable "to communicate her needs or anything of that sort," that she was "not connected with any local services when typically an individual like herself would be," and that her disabilities impeded Nancy's ability to care for herself.

¶7 Following the hearing, the circuit court ordered a temporary guardianship of Nancy's person but not of her estate, and a temporary protective placement pending the hearing for a permanent protective placement.

¶8 On October 16, 2024, the County filed a petition for permanent guardianship of Nancy's person and estate. On October 28, 2024, Nancy, through counsel, filed a motion to dismiss the petition on the ground that the circuit court lacked personal jurisdiction to hear the petition pursuant to WIS. STAT. § 53.23. Nancy alleged that an "Emergency Petition for Appointment of Temporary Guardian and Permanent Guardian for Adult" had been filed in Iowa on October 23, 2024. Nancy also alleged that she resided at 316 Lucas Avenue, Eagle Grove, Iowa; that a bank statement confirmed that address; and that the bank statement showed Nancy had "lived there since at least March 31, 2023." Nancy's motion to

dismiss included as attachments the alleged Iowa petition and a photo of the address portion of a bank statement.

¶9　In response, the County stated that Nancy had been present in Wisconsin during the summer of 2023 and since July 2024, but the County admitted that it did not know where Nancy had been physically present between September 2023 and July 2024 and that "therefore Wisconsin cannot be proven to be [Nancy's] home state." The County argued, however, that Nancy had a significant connection to Wisconsin that established jurisdiction pursuant to WIS. STAT. § 53.23(2)(a). The County further argued that the Iowa attorney who drafted the Iowa petition "was not made aware of the temporary [g]uardianship in Douglas County," that the Iowa petition "fails to mention the Douglas County orders," and that the Iowa petition "appears to have been orchestrated as a collateral attack on this Court's jurisdiction."

¶10　On October 29, 2024, the circuit court held a hearing to first address Nancy's motion to dismiss and then the permanent guardianship and protective placement petitions. At the start of the hearing, the court asked Nancy's counsel whether he wanted to add anything to the motion to dismiss. Counsel responded that he sought to take testimony to bolster the motion's factual basis.[3] Counsel called Katie to testify in support of Nancy's motion, while Johnson testified for the County.

---

[3] Nancy claims that the circuit court shifted the burden to her to prove jurisdiction by asking her counsel this question. However, it is clear that the court simply asked whether Nancy wanted to present additional evidence in support of her motion, which Nancy did. As noted below, the fact that the court found that evidence not credible does not mean that it shifted the burden to Nancy or that the court did not hold the County to its burden, as Nancy contends.

¶11     Katie testified that Nancy had always resided with her and that they had been living at 316 South Lucas Avenue, Eagle Grove, Iowa, for four years. Katie also testified that her driver's license, which was admitted into evidence, was an Iowa license issued in 2023. The parties stipulated that Nancy and Katie had an Iowa bank account and that the bank statement attached to Nancy's motion had an Iowa address on it. Katie further testified that she had lived in Iowa for 46 years and that Nancy had lived there for 18 years.

¶12     Regarding family contacts, Katie testified that Nancy's two brothers, Nancy's nephew, and Nancy's sister-in-law resided in Iowa. Katie added that Chad was from Iowa but that he was not currently in Iowa because he "deals with paranoid schizophrenia and with all that has gone on, he is in St. Cloud at Place of Hope." Katie also testified that Nancy had a doctor in Iowa who had been treating Nancy since she was four years old.

¶13     As to Nancy's whereabouts, Katie testified that she and Nancy were in Iowa in 2023. She stated that she and Nancy came to Wisconsin on August 5, 2024, to check on Chad, who had been in Wisconsin since July 2024. Katie explained that if "things were not going well," she and Nancy would return to Iowa, but that "things were going very well" so they stayed longer. She added that she had remained in Wisconsin because of Nancy's guardianship proceedings.

¶14     Katie also testified that she had started a guardianship proceeding in Iowa in July 2024, before Nancy turned 18, and that her "attorney did not finish it. He was supposed to finish it by August 15th and he did not." Katie testified that, following the start of guardianship proceedings in Wisconsin, her attorney petitioned for emergency guardianship in Iowa, and the judge in that case was "just waiting for the official background check to come through."

¶15    On cross-examination, Katie testified further about Nancy's whereabouts between 2023 and 2024. Katie stated that she, Chad and Nancy were in Superior, Wisconsin, in May 2023, and that she had contact with law enforcement twice during that time. Katie admitted telling law enforcement that she, Chad and Nancy had "left [their] lives in Iowa to be" near a pastor in Proctor, Minnesota. Katie then clarified that she "misspoke" about what she told law enforcement, that she was not planning to stay in Wisconsin, but that she and her family had come to visit the pastor. Katie then stated that she remained in Wisconsin from May 2023 until the middle of June 2023.

¶16    Katie further testified that she went to a homeless shelter in Ashland, Wisconsin, around September 2024 and that she worked briefly at the Bad River Casino at that time. Katie also recalled speaking to law enforcement in her tent on Barker's Island, but she did not recall stating that she wanted to stay in the area long term. She also testified that she spoke with law enforcement about six to ten times between 2023 and 2024 and that she would be surprised if all of the law enforcement reports listed her address as homeless because she provided her Iowa address. Upon further cross-examination, Katie testified that Chad had never lived at her current home in Iowa, that her son paid the rent for the Iowa home, that she had paid the rent in the past, and that rent was paid through November 2024. Katie added that she was self-employed and worked for Family Homestead Oils.

¶17    In response to the circuit court's question regarding why she lived at a homeless shelter in Ashland and in a tent on Barker's Island when she had a home in Iowa, Katie responded that she was trying to reunite her family and that she and her family were camping on Barker's Island and not living in a tent. The court also asked Katie why she needed another job at the casino when she worked for Family Homestead Oils. Katie responded that she could "do the Homestead

Oil[s] job anywhere" and that she "chose to get a job" at the casino because she, Chad and Nancy "were going to possibly stay at that resort longer and [the job] gave a discount at that place." When the court asked where Katie stayed when she was in Wisconsin, she responded that she stayed at the Ruth House.[4] The court further asked Katie why she did not rent an apartment or stay at a hotel while she was in Wisconsin. She responded that she was "not ready to put down roots" in Wisconsin because her family was in Iowa and that she and Chad had a "contracting business" but they had not decided in which area to do it.

¶18 On redirect examination, Katie testified that she and Nancy were in Wisconsin in February 2023 to reunite with Chad, but they returned to Iowa in March and did not return to Wisconsin until August 2024. On recross-examination, Katie admitted that she and Nancy were screened for long-term public services in Douglas County. She also testified that Nancy received therapy services and medications in Iowa. Katie further stated that she informed the Iowa attorney about the guardianship proceeding in Wisconsin and that she would be surprised that the attorney said he did not know about the Wisconsin proceedings.

¶19 Johnson testified that she had prior contacts with Nancy and Katie, and that she had reviewed reports indicating that Nancy and Katie were in Superior in 2023. She stated that Katie had provided multiple reasons for why she and Nancy were in Douglas County, including "camping for retirement," "vacation," "looking for [Nancy's father] in the area," and "moving into the

---

[4] At the hearing on the temporary petitions, Jones described the Ruth House as a local organization that provided services, such as food, and sometimes allowed people to stay overnight.

apartments when it got cold out." Johnson also testified that she had only heard of Katie having a job at the casino and that she was unaware of the pastor in Proctor whom Katie mentioned.

¶20 Johnson also testified that, based on her investigation of the case and other statements she had heard, she believed Nancy and her family intended to stay in Douglas County because they were looking for services from the DHHS, the Aging and Disability Resource Center ("ADRC"), and other local agencies in September 2024. Johnson added that Nancy and her family did not contact the DHHS at any point prior to September 2024. Johnson also stated that she asked Katie where she and Nancy resided when they sought DHHS services, and Katie stated they resided at Barker's Island. She added that Katie never mentioned an Iowa address or the Ruth House.

¶21 Following Katie's and Johnson's testimony, the circuit court concluded that Nancy did not have a "home state" because neither Wisconsin nor Iowa met the definition in WIS. STAT. § 53.02(7). The court also found Katie was not credible, stating that "[s]ome of her discussions, you know, she talks about working places. She adds more places she's working. She talks about paying rent and then not paying rent. I just don't believe it. I don't believe—I think it's a manufacturing for jurisdiction." The court explained that having a driver's license and address in Iowa did not mean that was where Katie and Nancy had been living, commenting, "Why would you live in a tent on Barker's Island when you have a home in Iowa? It just defies all logic." The court further found that the only credible information Katie provided was that she and Nancy had been in Wisconsin since August 5, 2024, because the evidence supported that information.

¶22    The circuit court also concluded that Wisconsin was a "significant-connection state," as provided in WIS. STAT. § 53.21, and, because Nancy did not have a home state, the court had jurisdiction pursuant to WIS. STAT. § 53.23(2)(a). Because the court concluded it had jurisdiction, it denied Nancy's motion to dismiss, proceeded to address the permanent guardianship and protective placement petitions, and ultimately entered orders granting those petitions. Nancy appeals. Additional facts will be provided below as necessary.

## DISCUSSION

¶23    On appeal, Nancy argues that the County failed to establish that the circuit court had personal jurisdiction over her to order a guardianship and protective placement. "In order for a Wisconsin court to have jurisdiction over a person, there must be a statutory basis for personal jurisdiction."[5] *Bushelman v. Bushelman*, 2001 WI App 124, ¶7, 246 Wis. 2d 317, 629 N.W.2d 795. "The burden is on the party filing the action"—here, the County—"to establish personal jurisdiction." *See id.* On appeal, we will not set aside the circuit court's findings of fact unless they are clearly erroneous, but we independently review whether those facts meet the statutory requirements for personal jurisdiction. *Id.*, ¶17.

¶24    This appeal also involves statutory interpretation, which is a question of law that we review de novo. *Robin K. v. Lamanda M.*, 2006 WI 68, ¶13, 291 Wis. 2d 333, 718 N.W.2d 38. "The purpose of statutory interpretation is to give the statute its full, proper, and intended effect." *Id.* When reviewing a

---

[5] In addition, the application of the statute to the individual must comport with the requirements of due process. *Bushelman v. Bushelman*, 2001 WI App 124, ¶7, 246 Wis. 2d 317, 629 N.W.2d 795. Nancy does not raise any argument regarding due process in this case, so we do not address that issue further.

statute, we begin with its language and give that language its "common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." *See State ex rel. Kalal v. Circuit Ct. for Dane Cnty.*, 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110. We also interpret statutory language "in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results." *Id.*, ¶46.

¶25 WISCONSIN STAT. ch. 53 applies to jurisdiction determinations for purposes of adult guardianship and protective placement proceedings. *See* WIS. STAT. § 53.01. There are three ways in which a Wisconsin court has personal jurisdiction to appoint a guardian of the person or issue an order appointing a guardian of the estate. WIS. STAT. § 53.23(1)-(3). Relevant here, a court has personal jurisdiction if,

> [o]n the date the petition is filed, this state is a significant-connection state and any of the following is satisfied:
>
> (a) The respondent does not have a home state or a court of the respondent's home state has declined to exercise jurisdiction because this state is a more appropriate forum.

Sec. 53.23(2)(a).[6] In other words, to establish personal jurisdiction, the County had to show that on the date the petitions were filed, Wisconsin was a "significant-connection" state, and either Nancy did not have a "home state" or a

---

[6] As used in WIS. STAT. ch. 53, a "[r]espondent" is "an adult for whom an order appointing a guardian of the estate or the appointment of a guardian of the person is sought." WIS. STAT. § 53.02(14).

11

court of Nancy's home state had declined to exercise jurisdiction because Wisconsin was a more appropriate forum.

¶26 The "home state" is "the state in which the respondent was physically present, including any period of temporary absence, for at least 6 consecutive months immediately before the filing of" a petition; "or if none, the state in which the respondent was physically present, including any period of temporary absence, for at least 6 consecutive months ending within the 6 months prior to the filing of the petition." WIS. STAT. § 53.02(7).

¶27 A "[s]ignificant-connection state" is "a state, other than the home state, with which a respondent has a significant connection other than mere physical presence considering the factors in [WIS. STAT. §] 53.21." WIS. STAT. § 53.02(16). The five factors that a court must consider when determining whether a respondent has a significant connection with a state are:

> (1) The location of and strength of connection to the respondent's family, other significant social connections, and service providers.
>
> (2) The location of other persons required to be notified of the guardianship of the person proceeding or proceeding to appoint a guardian of the estate and the location of substantial evidence relating to the respondent.
>
> (3) The length of time the respondent at any time was physically present in the state, past or current status as a resident, and the duration of any absence.
>
> (4) The location of the resident's property.
>
> (5) The extent to which the respondent has ties to the state, such as voting registration, state or local tax return filing, vehicle registration, driver's license, work, social relationship, and receipt of services.

Sec. 53.21(1)-(5).

¶28 Nancy argues that the County failed to show that Wisconsin was a significant-connection state because the County presented evidence of Katie's connection to Wisconsin, rather than Nancy's connection, and the evidence it presented of Katie's connection was weak. Nancy further contends that the only finding the circuit court made regarding the significant-connection factors was that Katie was not credible and that the court implicitly concluded Wisconsin was a significant-connection state without discussing the statutory factors. Nancy does not dispute the court's determination that Wisconsin was not her home state, but she argues that the County failed to show that she did not have a home state and that the evidence instead showed that Iowa was her home state.

¶29 Although the circuit court did not address each significant-connection factor in WIS. STAT. § 53.21, we conclude that the evidence presented by the County at the hearings on both the temporary and permanent petitions for guardianship and protective placement supports the court's conclusion that Wisconsin was a significant-connection state at the time the petitions were filed on October 1 and 16, 2024. We further conclude that the court correctly determined, based on the evidence presented, that neither Wisconsin nor Iowa was Nancy's home state as defined in WIS. STAT. § 53.02(7).

¶30 At the hearing on the temporary guardianship and protective placement petitions, Jones testified that she had between eight and ten interactions with Nancy. Specifically, she first met Nancy in August 2024, when Nancy was running down a street, in and out of traffic, and officers led her into the police department. Jones testified that she met Nancy at the door to the department after officers opened it and Nancy ran inside. Jones stated that it took her ten minutes to learn Nancy's name and that Chad arrived thereafter. She further stated that Katie was in her vehicle in the building's parking lot at the time.

¶31    Jones testified that her next interaction with Nancy occurred the following week, when the police department received a call about individuals camping in the Superior Municipal Forest. Jones stated that she and other officers offered resources to Nancy and her parents, who were the reported campers. She also noted that Nancy and her parents had used those resources because they had gone to the Ruth House for meals and they were connected to a church for food, showering and clothing. According to Jones, Nancy and her family left the municipal forest and went to Ashland, but they returned after September 20, 2024, when Jones had her next interaction with Nancy.

¶32    Jones testified that on that occasion the police department received a call about individuals camping on Barker's Island. Jones spoke with Katie, who informed Jones that she, Chad and Nancy had been sexually assaulted at a shelter in Ashland. When Jones offered to set up services, in the form of either law enforcement services or medical services for Nancy, Katie refused. A few days later, Jones again made contact with Nancy and her family at a gas station. Jones testified that as she attempted to speak with Nancy, she was running onto a busy road and ended up running into the gas station car wash.

¶33    Jones also testified that her final interaction with Nancy occurred on September 30, 2024, when she and other officers attempted to take Nancy to a hospital. At one point, Jones testified, Katie had a "defensive stance" against officers, told Nancy to run, and Nancy ran out of Katie's vehicle and into the Ruth House.

¶34    Next, Johnson testified about two interactions that she had with Nancy. She stated that she first met Nancy when Nancy and her parents were speaking to one of Johnson's colleagues. Johnson explained that she was in her

14

office when she heard Nancy bang on her door, so Johnson left her office and spoke with Nancy, who asked Johnson's name multiple times and seemed fixated on Johnson's name tag.

¶35    Johnson also testified that she was present when officers attempted to take Nancy to the hospital on September 30, 2024. Johnson stated that when she arrived, officers were talking to Katie and trying to talk to Nancy, but that Katie was standing in front of her vehicle and blocking access to Nancy. Johnson further stated that when she was able to speak to Nancy, Nancy "did not seem to understand what [Johnson] was explaining to her in that she was going to be transported to the hospital." Johnson was also concerned for Nancy's safety because Katie was telling Nancy to run, that Nancy did so, and that Nancy became agitated when officers chased her down the roads.

¶36    Finally, Hendrickson-Schurke testified that she initially examined Nancy for 15 minutes upon her arrival at the hospital on September 30, 2024. She testified that Katie arrived with Nancy, that Katie initially spoke for Nancy, but nursing staff and security officers ultimately removed Katie from the exam room because she was impeding Hendrickson-Schurke from conducting a safe and secure assessment of Nancy. Hendrickson-Schurke also testified that she was unable to access Nancy's prior medical records and that she was unable to get Nancy's prior medical history from Katie.

¶37    The above evidence presented by the County at the temporary guardianship and protective placement hearing, together with the evidence presented at the permanent guardianship and protective placement hearing, supports the circuit court's conclusion that Wisconsin was a significant-connection state in the months leading up to the filing of the guardianship and protective

placement petitions. First, the County provided evidence relating to the location of, and Nancy's connection to, her family and service providers. *See* WIS. STAT. § 53.21(1). Jones and Johnson testified about Nancy's use of services in Wisconsin, including the Ruth House, the DHHS, and a homeless shelter in Ashland.

¶38 Also evident from the testimony was Nancy's connection to her parents, both of whom were in Wisconsin and were highly involved with Nancy. Every time these witnesses attempted to interact with Nancy, she was either with Katie, Chad or both. Nancy's close connection to Katie is also evident, given her attempts to speak or intervene on Nancy's behalf. Although the circuit court considered Katie's testimony regarding Nancy's familial connections in Iowa, the County clearly showed that Nancy had a strong connection to her parents, both of whom were then in Wisconsin and had been for a fair amount of time. Thus, the evidence presented by the County regarding Nancy's connections to family and service providers in Wisconsin at the time the petitions were filed supported the court's conclusion that Wisconsin was a significant-connection state.

¶39 Second, the County presented evidence of the location of persons required to be notified of Nancy's guardianship proceedings and the location of substantial evidence relating to Nancy at the time the petition was filed. *See* WIS. STAT. § 53.21(2). Both sets of evidence were strongly tied to Wisconsin. Those persons entitled to notice for guardianship proceedings include "[a]ny presumptive adult heirs, as specified in [WIS. STAT. §] 851.09," of the respondent.[7] WIS. STAT.

---

[7] An "[h]eir" is "any person … who is entitled under the statutes of intestate succession to an interest in property of a decedent." WIS. STAT. § 851.09. This definition includes a parent. *See* WIS. STAT. § 852.01(1)(c).

16

§ 54.38(2)(b)3. Here, those people included Katie and Chad, who were both with Nancy during interactions with local law enforcement and the DHHS. The guardianship and protective placement petitions noted Katie as an interested party entitled to notice, and she appeared at all hearings.[8]

¶40 Furthermore, the County's evidence regarding the need for a guardianship was located in Wisconsin. Jones and Johnson testified about Nancy's condition during their multiple interactions with Nancy and her family, all of which occurred in Wisconsin. Although Nancy's medical evaluation occurred in Duluth, Minnesota, the examining psychologist's October 1, 2024 report was provided to the circuit court at the temporary guardianship hearing pursuant to WIS. STAT. § 54.50(3)(c), and the examining psychologist testified about the report at the permanent guardianship hearing. While Katie testified that Nancy had a treating doctor in Iowa, received therapy services in Iowa, and received medications in Iowa, the evidence relating to Nancy's need for a guardianship at the time the petitions were filed was mostly in Wisconsin. Thus, the County's evidence regarding the location of persons requiring notice and the location of substantial evidence relating to Nancy's need for a guardianship supported the court's conclusion that Wisconsin was a significant-connection state.

¶41 Third, the County presented evidence regarding the length of time that Nancy was physically present in Wisconsin. *See* WIS. STAT. § 53.21(3). The circuit court considered Katie's testimony that she and Nancy visited Wisconsin

---

[8] Although Chad was also entitled to notice, both Nancy and the County acknowledge that Chad was reported missing at the time the petition was filed.

sporadically in 2023 and 2024, but it did not find that testimony credible. Instead, it found that the evidence established that Nancy had been in Wisconsin continuously since August 5, 2024. That finding is supported by Jones' and Johnson's testimony regarding their interactions with Nancy and her family, all of which occurred in August and September 2024. As a result, Nancy had been physically present in Wisconsin for about two months at the time the County filed its guardianship and protective placement petitions.

¶42 Fourth, there was limited evidence presented regarding the location of Nancy's property that would be subject to a guardianship. *See* WIS. STAT. § 53.21(4). The parties stipulated that Nancy and Katie had an Iowa bank account, but there was no additional evidence regarding assets in that bank account. The County admits that "the only evidence that [Nancy] owned any property would have been in the form of personal property held by her at the time she was placed under temporary protective placement." However, the County did not present evidence of any property that Nancy held at that time. Therefore, this fourth factor regarding the location of Nancy's property does not support a conclusion that Wisconsin is a significant-connection state.

¶43 Finally, the County presented evidence of Nancy's ties to Wisconsin, mostly in the form of "receipt of services." *See* WIS. STAT. § 53.21(5). Given Nancy's cognitive limitations, it was reasonable for the circuit court to infer that Nancy did not have a driver's license, tax return filings, voting registration, or vehicle registration, either in Wisconsin or any other state. As noted above, Nancy had engaged with the Superior Police Department, the Ruth House, another unnamed shelter in Ashland, the ADRC, and the DHHS at the time the petition was filed. We agree with the County that Nancy's limited receipt of services "was not because [Nancy] did not require more or that a state other than Wisconsin was

providing them," but because Nancy "was a vulnerable adult who had no family, social [connections] or means of getting help or services from anyone other than her mother" and because Nancy's "isolation and dependency on her family for care created barriers to her receiving services that would ensure her safety and provide necessary medical care and assistance for her daily living activities." Thus, the County's evidence regarding Nancy's ties to Wisconsin in the form of receipt of services supports the circuit court's conclusion that Wisconsin was a significant-connection state.

¶44    Taken together, the County's evidence established that Nancy had a significant connection with Wisconsin other than her mere physical presence there. *See* WIS. STAT. § 53.02(16). Thus, the County's evidence supported the circuit court's conclusion that Wisconsin was a significant-connection state at the time the guardianship and protective placement petitions were filed.

¶45    The County also presented evidence supporting the circuit court's conclusion that Nancy did not have a home state as defined in WIS. STAT. § 53.02(7). Nancy contends that the evidence established that Iowa was, in fact, her home state because the reasonable inference from Katie's testimony was that Nancy was in Iowa for the six months prior to August 5, 2024, and the County presented no evidence that Nancy was anywhere but Iowa between June 2023 and August 2024. As the County notes, however, its evidence showed that Nancy and Katie were "transient and as such, pinning down [Nancy's] physical presence in a particular location [was] impossible."

¶46    We agree with the County that, based on the evidence presented regarding Nancy's whereabouts prior to August 5, 2024, and the circuit court's finding that Katie's testimony was not credible, it was difficult to establish

Nancy's physical presence at a particular location for the 6 to 12 months prior to the filing of the petitions. We disagree with Nancy, however, that such a difficulty opposes Wisconsin jurisdiction in this proceeding.

¶47 The circuit court agreed with the County that Nancy was not physically present in Iowa for at least six consecutive months before the petition was filed, given the evidence that Nancy and Katie had been in Wisconsin since at least August 2024. The court acknowledged the Iowa address on Katie's driver's license, but it did not believe having such a license meant that Iowa was where she and Nancy had been living. The court reasonably questioned why Nancy and Katie would live in a tent on Barker's Island when they had a home in Iowa. Again, the court found Katie not credible in her testimony pertaining to the Iowa residence, stating that it did not "believe where she's been spending her time." Given the evidence of Nancy's transient nature and Katie's lack of credibility, the court could not reasonably infer that Nancy was only in Iowa prior to April 2024—i.e., for at least six consecutive months ending within the six months prior to the filing of the petition. Thus, it was reasonable for the court to conclude that Iowa was not Nancy's home state.

¶48 Because Wisconsin was a significant-connection state at the time the guardianship and protective placement petitions were filed and because Nancy did not have a home state at that time, jurisdiction was established under WIS. STAT. § 53.23(2)(a). Accordingly, the circuit court did not err by concluding it had personal jurisdiction to order guardianship and protective placement pursuant to § 53.23.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.